**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **WILLIAM HARPER, Jr.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case number 4:14cv0088 TCM** |
| ) | |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM AND ORDER**

This 42 U.S.C. §§ 405(g) and 1383(c)(3) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of William Harper, Jr. (Plaintiff) for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b, is before the undersigned United States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).

**Procedural History**

Plaintiff applied for SSI in August 2010, alleging he was disabled as of November 6, 1994,[1] by hepatitis C, hyperthyroidism – sweating, nausea, breathing trouble, arthritis, bipolar, and depression.  (R.[2] at 146-49, 169.)  His application was denied initially and after an administrative hearing held in March 2012 before Administrative Law Judge (ALJ) Victor

---

[1] The alleged disability onset date was later amended to the date he filed his application.

[2] References to "R." are to the administrative record filed by the Commissioner with her answer.

Horton.  (Id. at 16-30, 35-82, 89-95.)  The Appeals Council denied Plaintiff's request for review, id. at 1-3; this action followed.

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Robin Cook, Ph.D., testified at the administrative hearing.

Plaintiff was 50 years old at the time of the hearing and had been living at the Harris House for three months.  (Id. at 42.)  He was at Harris House because he was addicted to pain medication and heroin.  (Id. at 56.)  For fifteen years before that, he lived with his elderly parents and his younger brother.  (Id. at 42-43.)  He is 5 feet 5 inches tall and weighs 135 pounds.  (Id. at 46-47.)  Plaintiff left school after the seventh grade and received his General Equivalency Degree (GED) when in prison on a burglary conviction.  (Id. at 44-46.)  He can read and do arithmetic, but has trouble spelling.  (Id. at 47.)  His driver's license was taken away when he was stopped for driving while his license was suspended.  (Id. at 50.)  He can "get [it] back now."  (Id.)

Plaintiff testified that he does not have to do any chores at Harris House because the monitors know he cannot.  (Id. at 48.)  He does have to make his own bed.  (Id.)

Plaintiff has not worked at any jobs in the last fifteen years.  (Id. at 48-49.)  His last job was doing spot welding of the bottom of chairs.  (Id. at 49.)  It was a temporary job.  (Id. at 50.)

Asked to explain why he cannot work, Plaintiff testified that he cannot use his right arm because it swells.  (Id. at 51.)  Also, his back occasionally "hurts a lot."  (Id.)  He has

been diagnosed with two herniated discs and "a smashed vertebrae." (Id.) He gets tired and his knees, legs, and shoulders hurt. (Id. at 53-54.) He suffers from major depression, and was first diagnosed with it in approximately 1998. (Id. at 54.) He has been taking a mood disorder medication for the past year. (Id. at 55.) He was taking his medications when first released from prison but then did not have the means to get any until he received Medicaid. (Id. at 55-56.) His hypertension is controlled by medication and diet. (Id. at 56.) He takes an opiate blocker once a month and last used heroin in November 2011. (Id. at 58, 61.) He does not have any side effects from his medications. (Id. at 59.)

Plaintiff smokes "[a]lmost a pack [of cigarettes] a day." (Id.) He no longer drinks, but cannot recall when he last drank beer. (Id. at 59, 63.) He has not tested positive for drugs or alcohol since being in Harris House. (Id. at 64.)

When living with his parents, Plaintiff did not do any household chores, cooking, or yard work. (Id. at 65-66.) His brother did all that. (Id. at 66.)

Plaintiff testified that he cannot walk farther than two blocks without having to stop and rest, cannot stand for longer than thirty minutes, and cannot sit for longer than an hour without his back hurting. (Id.) He can lift approximately ten pounds with his right hand and a "normal" weight with his left. (Id. at 67.) His doctors have not placed any lifting limitations on him in writing. (Id.)

Plaintiff typically gets up around 6 o'clock in the morning. (Id. at 68.) Half an hour later, he has morning meditation for fifteen minutes. (Id. at 69.) He then lies down until a job skill group at 10:30, followed by a narcotics or alcoholics anonymous meeting, lunch, and

a process group.  (Id. at 69-70.)  After that, he sits and watches television.  (Id. at 70.)  He has another group later in the evening.  (Id.)  Asked to describe his general mood, he said it was "okay."  (Id.)  Once or twice a week, he cries and hyperventilates for approximately thirty minutes.  (Id. at 70-71.)  His memory is "not too good," nor is his concentration.  (Id. at 71-72.)  He does not have any difficulties dressing or bathing, but writing or gripping things makes his hands cramp.  (Id. at 72.)

Dr. Cook, testifying as a vocational expert without objection, was asked to assume a hypothetical individual of Plaintiff's education, training, and work experience who was limited to light jobs that did not require more than occasional stooping, balancing, kneeling, crouching, crawling, and climbing.  (Id. at 75.)  This individual is limited to frequent fine fingering and manipulation and must avoid concentrated exposure to extreme cold.  (Id.)  He can understand, remember, and carry out at least simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple work-related decisions; respond appropriately to supervisors and co-workers in a task-oriented setting with casual and infrequent contact with others; adapt to routine, simple work changes; and perform repetitive work according to set procedures sequence and pace.  (Id. at 75-76.)  Dr. Cook testified that this individual can work as a garment sorter or photocopying machine operator.  (Id. at 76.)

If this individual is limited to lifting ten pounds with his dominant right arm and has no similar restriction on the use of his left arm, these jobs would not be affected.  (Id. at 76-77.)

If this individual is limited to occasional reaching overhead with his right arm, the job of garment sorter would be affected. (Id. at 77-78.) Also available, however, was a job as an office helper. (Id. at 78.)

If the individual would be absent two days per month, the jobs would be eliminated unless there were accommodations. (Id.) If the individual would have to nap during the day in addition to scheduled breaks, he would not be capable of performing any work. (Id. at 79.)

Dr. Cook stated that, unless otherwise explained, his testimony was consistent with the *Dictionary of Occupational Titles* (DOT). (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from health care providers, including those employed by the Missouri Department of Corrections (DOC), and assessments of his physical and mental functional capacities.

On a Disability Report form completed when applying for SSI, Plaintiff disclosed that he had stopped working on December 31, 1995, because of his condition. (Id. at 169.) He last worked from 1994 to 1995 as a welder for a furniture company. (Id. at 170.) He had worked from 1978 to 1994 as a baker. (Id.) On a Function Report, Plaintiff disclosed that he has no problems with personal care tasks with the exception of bathing. (Id. at 176.) He becomes short of breath when showering. (Id. at 175, 176.) The only chore he does is his laundry, which takes a couple of hours every week. (Id. at 177.) His impairments adversely affect his abilities to lift, squat, bend, walk, kneel, climb stairs, and get along with others. (Id.

at 180.)  They do not affect his abilities to stand, reach, sit, remember, complete tasks, concentrate, follow instructions, or use his hands.  (<u>Id.</u>)  He gets along well with authority figures, but does not handle stress or changes in routine well.  (<u>Id.</u> at 181.)

In August 2011, Plaintiff was approved by the Missouri Department of Social Services for benefits under the Missouri HealthNet for the Aged, Blind, and Disabled, effective February 1, 2011.  (<u>Id.</u> at 379-80.)

Included in the record was a May 2012 summary report of an investigation of Plaintiff by members of the Cooperative Disability Investigations Unit.  (<u>Id.</u> at 236-41.)  The report included a list of "violations/actions" since his original alleged onset date of 1994.  (<u>Id.</u> at 238-39.)  The list included a 1991 active warrant for a failure to appear on a driving while intoxicated charge and driving while suspended and a 2008 active warrant for no fare transit. (<u>Id.</u> at 238.)  He was currently on probation/parole for burglary second degree and assault on a law enforcement officer.  (<u>Id.</u>)  His background check also revealed seventeen arrests between July 1997 and December 2008, the last being for a felony probation violation.  (<u>Id.</u> at 238-39.)  The investigators went to the building housing the offices of a physician who was to conduct a consultative examination of Plaintiff and saw Plaintiff walk on the sidewalk leading to the front doors.[3]  (<u>Id.</u> at 240.)  Plaintiff was seen carrying an envelope and examining papers as he walked.  (<u>Id.</u>)  They reported that Plaintiff "walked with a fast pace, a normal gait, and without any assistance."  (<u>Id.</u>)  After the examination, Plaintiff was seen walking away from the building "with a normal gait and without any assistance."  (<u>Id.</u>)  He

---

[3]The physician was Dr. Morris.  <u>See</u> pages 19 to 22, infra.

walked down fifteen steps without any difficulty.  (Id.)  "[H]e did not appear to have any physical limitations."  (Id.)  Plaintiff was followed as he boarded and rode a light rail train and as he waited for a bus.  (Id.)  A copy of the surveillance video was made available to Plaintiff's counsel.  (Id. at 243-44.)  Counsel responded that the video showed Plaintiff walking for less than two minutes, and conceded that he could "walk for more than two minutes in an eight-hour day."  (Id. at 246-47.)

Plaintiff's medical records begin in July 2001 when he was treated at the emergency room of St. Alexius Hospital for complaints of low back pain that radiated down his right leg and had begun three days earlier.  (Id. at 487-95.)  X-rays revealed minimal osteoarthritis, spur formation from L5 through S1, and narrowing of the disc space between L5-S1.  (Id. at 495.)

The next medical records are from the DOC.  (Id. at 254-320.)

On February 2, 2009, Plaintiff had a mental health intake evaluation.  (Id. at 254-55.) He reported that he had been treated for depression, including several hospitalizations, but was no longer depressed.  (Id. at 254.)  His drug of choice was heroin, which he last used in December 2008.  (Id.)  On examination, he was alert and oriented to time, place, and person; had directed thought; and had no delusions or homicidal or suicidal ideations or plans.  (Id.) His speech was logical and goal-directed.  (Id.)  Plaintiff also had an intake physical examination.  (Id. at 256-58.)  He did not have a medical problem needing immediate attention.  (Id. at 256.)  He did not have a medical problem that the Department needed to know about.  (Id. at 257.)  He did not have any pain, injuries, illnesses, or other symptoms

that suggested a need for a medical referral.  (Id.)  He did have hepatitis and was given a handout on hepatitis C and referred to infection control.  (Id. at 257, 258.)

On February 26, Plaintiff sought medical care for complaints of arthritis in his back and legs.  (Id. at 264-65.)  He walked with a steady gait and reported a history of back problems.  (Id. at 264.)  He also reported that he had had hepatitis C for ten years.  (Id. at 265.)  A hepatitis C panel was ordered.  (Id.)

Plaintiff returned to the nurse on March 19 with "multiple complaints," including arthritis, gastrointestinal problems, hernias, and sinus problems.  (Id. at 265-66.)  He was given an antacid and allergy pills.  (Id. at 266.)

The following month, baseline chest x-rays were taken, revealing a parahilar interstitial thickening and findings suggestive of mild granulomatous changes.  (Id. at 267.)  Four days later, Plaintiff explained to a nurse that he had been receiving interferon treatment for his hepatitis C but stopped it due to his heroin habit.  (Id. at 268.)  He was advised to speak with a doctor about treatment options, and did.  (Id. at 269, 270.)  He told the doctor he had had to stop interferon treatment because of its side effects, including nausea, vomiting, and weight loss.  (Id. at 270.)  The doctor noted that Plaintiff's hyperthyroidism would interfere with his hepatitis C treatment.  (Id. at 273.)

When seeing a nurse on May 7 after transfer to a new institution, Plaintiff reported that his feet and ankles were constantly swollen.  (Id. at 279.)  He declined interferon-based therapy for his hepatitis C.  (Id. at 283.)

Four days later, he sought medical attention for complaints of arthritis pain, particularly in his knees. (Id. at 284.) He was described as "frail looking, pale and slouched over in chair." (Id.) He was scheduled to see a doctor, and did. (Id. at 285-86.) His hands were swollen; his right elbow was tender. (Id. at 285.) He reported that his knees, fingers, elbows, and back were tender and painful, and had been for most of his life. (Id.) Plaintiff was to have x-rays taken of his hands and knees. (Id. at 286.) The x-rays were negative for any bony abnormalities. (Id. at 295-96.)

On May 26, Plaintiff complained to a nurse of restlessness, an increased heart rate, heat intolerance, nervousness, breathlessness, increased bowel movements, trembling hands, and weight loss. (Id. at 286.) The trembling had begun in 2006. (Id. at 287.) He was prescribed methimazole, a medication used to treat hyperthyroidism. (Id.)

In August, Plaintiff sought medical attention for complaints of occasional swelling in his legs. (Id. at 307.) He reported that reducing his salt intake had helped. (Id.) He was to follow-up in November. (Id.)

In September, Plaintiff complained to a nurse of pain that was not controlled by medication, swelling in his lower legs, and urinary frequency. (Id. at 307-08.) He was to be referred to a doctor for evaluation of his pain medication and was to have a urine analysis. (Id. at 308.) He later requested referral to a dentist to have teeth pulled. (Id. at 309.) The doctor saw him and continued him on his current medications, including ibuprofen, and treatment plan. (Id. at 309-10.) The urine analysis was negative. (Id. at 310.) A few days later, on October 6, the doctor discussed with Plaintiff the use of a diuretic to help reduce the

swelling.  (Id. at 310.)  Also, Plaintiff wanted to try a nonsteroidal anti-inflammatory drug (NSAID) for his arthritis and was given meloxicam and salsalate, both NSAIDs, in addition to hydrochlorothiazide (HCTZ), a diuretic.  (Id. at 310-11.)  Plaintiff reported on October 21 that the swelling in his legs was less, but the problems with frequent urination remained.  (Id. at 314.)  Doxazosin, used in the treatment of hypertension, was prescribed.  (Id.)  Plaintiff was told to increase his water intake.  (Id.)

On November 6, Plaintiff complained to a nurse of increased urination, fatigue, dry mouth, and swollen legs.  (Id. at 313-14.)  Two weeks later, Plaintiff reported to a doctor that he had had some mild improvement on the Cardura (a brand form of doxazosin) but was still having frequent urination without pain.  (Id. at 315.)  The dosage was increased.  (Id.)

Plaintiff informed the doctor in December that his urinary frequency was less.  (Id. at 317.)  In January 2010, Plaintiff reportedly was continuing to do well on the Cardura but was switched to Hytrin because Cardura was no longer available.  (Id.)

Plaintiff was released from custody in February 2010.  (Id. at 320.)

On March 28, 2011, Plaintiff was voluntarily admitted to the residential treatment program at Bridgeway Behavioral Health (Bridgeway) and discharged on April 4 when he dropped out of the program.  (Id. at 382-83.)  His primary diagnosis was opioid dependence.  (Id. at 382.)  On an Addiction Severity Index, Plaintiff reported that he was "[c]onsiderably" bothered by medical problems in the past thirty days.  (Id. at 384-90.)  In the past thirty days, he had used heroin for twenty-five.  (Id. at 386.)  For one of those thirty days, he had used more than one substance per day – which substance is not specified.  (Id.)  In the past thirty

days, Plaintiff had spent $2,500 on drugs. (Id.) Rating the severity of his alcohol and drug use, Plaintiff rated his drug use as an extreme problem and his alcohol use as a considerable problem. (Id.) He had been incarcerated for a total of sixty months during his lifetime; his last incarceration was for twenty-four months. (Id. at 387.) He had been moderately troubled by family problems in the past thirty days but not by social problems. (Id. at 389.) He had also experienced serious depression and anxiety during the past thirty days. (Id.) In that period, he had experienced psychological problems for two days. (Id.) The degree he was bothered was "slightly." (Id.)

Plaintiff consulted Tonya Little, M.D., with Grace Hill Health Services, Inc., on April 15 about his thyroid problem, arthritis, hepatitis C, and prostrate problems. (Id. at 409-24.) He had had thyroid problems for three years; they were getting worse. (Id. at 409.) His symptoms included dysphagia (difficulty swallowing), fatigue, insomnia, nervousness, rapid heart beat, skin and nail changes, tremors, and weight loss. (Id.) He had stopped taking medication for the problem when he got out of prison. (Id.) His arthritis pain was in his low back and both hands, knees, and feet. (Id.) The pain was constant and getting worse. (Id.) His prostrate problems included hourly frequency, incomplete emptying, and slow stream. (Id.) The problems had improved on medication when he was in prison. (Id.) He had drunk alcohol and used drugs, but had stopped the former in 2009 and the latter on March 20 of that year. (Id. at 410.) Plaintiff also reported symptoms of irritability, dyspnea (shortness of breath), an irregular heart beat, diarrhea, nausea, heat intolerance, muscle cramping, anxiety, depression, difficulty concentrating, headaches, memory impairment, mood swings,

paresthesia (sensation of tingling, tickling, pricing, or burning), poor or worsening memory, somnolence, and suicidal ideation. (Id. at 410-11.) On examination, Plaintiff was in no acute distress. (Id. at 412.) His heart rate and rhythm were regular. (Id.) There was no edema. (Id.) He was tender in the right upper quadrant of his abdomen. (Id.) He had a mildly reduced range of motion in his elbows and hands; a moderately reduced range of motion in his shoulders; and a full range of motion in his knees and feet. (Id.) His shoulders, elbows, and hands were warm, tender, and swollen. (Id.) He had a normal intellect and was alert and oriented to time, place, and person. (Id. at 413.) He had a blunted affect, felt hopeless, and was anxious. (Id.) He was to start taking tamsulosin for his prostrate problems, naproxen for his arthritis, and Remeron (an anti-depressant) for his unspecified episodic mood disorder. (Id.) He was to have lab work done and return in two to three weeks. (Id. at 413-14.) Also, he was referred to a urologist. (Id. at 415-16.)

Plaintiff returned to Dr. Little on May 6. (Id. at 425-27, 436, 454-56.) He appeared well-nourished, well-developed, and hydrated. (Id. at 426.) He had no swelling. (Id.) He was alert and oriented to time, place, and person. (Id.) He was to resume taking methimazole for his thyroid problems and to continue taking his other medications. (Id. at 426-27.) He was referred to St. Louis ConnectCare for endocrinology and hepatology evaluation and treatment. (Id. at 427.)

Six days later, Plaintiff went to the emergency room at St. Alexius Hospital with complaints of depression, agitation, anxiety, and suicidal thoughts without a plan. (Id. at 462-77.) He reported that he had been abstaining from alcohol, but had began drinking that day.

(Id. at 463.)  He had not used heroin for forty-five days.  (Id.)  On examination, Plaintiff's mood was anxious, depressed, and angry.  (Id.)  His judgment, insight, and memory were normal.  (Id.)  His affect was animated, and he was oriented to person, place, and time.  (Id.)  His mood ranged from crying to bargaining.  (Id.)  His grips were equal bilaterally; his gait was steady.  (Id. at 466.)  His blood tested positive for ethanol but not for illegal drugs.  (Id. at 473-75.)  He was given labetalol, a beta-blocker used to treat hypertension.  (Id. at 463.)  Four hours later, Plaintiff's condition was stable and he was discharged home with instructions to follow up with his thyroid doctor.  (Id. at 467, 472.)

In August, Plaintiff missed two new patient appointments with a urologist, Robert Maloney, M.D., at St. Louis ConnectCare.  (Id. at 440-41.)

Plaintiff consulted George Pelican, M.D., with St. Louis ConnectCare, on November 9 for treatment of his hepatitis C.  (Id. at 433-35, 442-44, 450-52.)  He reported that his hepatitis had been partially treated eight years earlier and then he had stopped treatment.  (Id. at 433.)  He had an occasional beer and used heroin daily.  (Id.)  He had an "[i]ll-appearing" general appearance.  (Id. at 434.)  He was to have lab work done and follow-up with the hepatitis C clinic.  (Id.)

Plaintiff again entered Bridgeway on November 22 and completed the program on December 19.  (Id. at 381, 391.)  It was recommended he follow-up with outpatient treatment.  (Id. at 381.)   On an Addiction Severity Index, Plaintiff again reported that he was "[c]onsiderably" bothered by medical problems in the past thirty days.  (Id. at 394-99.)  In the past thirty days, he had used heroin for twenty-four days and alcohol for two.  (Id. at 395.)

In the past thirty days, Plaintiff had spent $900 on drugs and $10 on alcohol. (Id.) Rating the severity of his alcohol and drug use, Plaintiff rated them both as between considerable and extreme. (Id.) He had been slightly troubled by family problems in the past thirty days but not by social problems. (Id. at 398.) He had experienced comprehension or memory problems during the past thirty days, but not serious depression and anxiety. (Id.) He rated the severity of psychiatric problems as moderate to considerable. (Id. at 399.) The degree he was bothered was "slightly." (Id.)

On December 20, Plaintiff was admitted to the Bridgeway out-patient program.[4] (Id. at 400-01.)

Plaintiff saw Dr. Little on January 9, 2012, reporting that he had been taking half the dose of methimazole because it made him feel "'nutty'" and needed a renewal of a prior referral for his hepatitis C. (Id. at 428-32, 437-38.) There was no swelling in his extremities. (Id. at 429.)

Plaintiff was seen by Tiana Hubbar, A.N.P. on January 20 for his hepatitis. (Id. at 445-49.) He reported that he wanted to finish the drug treatment program he was in before beginning treatment for the hepatitis. (Id. at 445.) He also reported feeling tired or poorly. (Id.) He had not drunk alcohol for a "long time" and had stopped using heroin sixty days earlier. (Id. at 446.) On examination, he had no anxiety, depression, joint pain, or muscle

---

[4]Dennis A. Droege, M.A., wrote to Plaintiff's counsel on January 17 to inform her that Plaintiff had been admitted to the long-term residential treatment program at Harris House on December 19, 2011, and was participating in all the individual and group programs and was testing negative on the random drug screens and breathalyzer tests. (Id. at 439.)

aches.  (Id.)  He did have shortness of breath on exertion.  (Id.)  His extremities were normal; his back was not tender; his ankles and feet were not swollen.  (Id. at 447-48.)  He was to have an abdominal ultrasound and a liver biopsy and return in six months.  (Id. at 448.)

Plaintiff had a computed tomography (CT) guided biopsy of his liver on January 30, revealing a small lingular nodule with subcentimeter node adjacent to the liver superiorly. (Id. at 478-86.)  A chest CT was recommended.  (Id. at 482.)

Also before the ALJ were reports of assessments of Plaintiff's functional limitations and abilities.

Plaintiff underwent a consultative physical examination in October 2010 by Raymond Leung, M.D.  (Id. at 324-29.)  His complaints included arthritis in all his joints, causing him difficulties gripping things with his hands; hyperthyroidism, the medications for which had run out, causing him to shake, lose weight, and easily become sick; and hepatitis C, for which interferon therapy had not helped.  (Id. at 324.)  He did not take any pain medications.  (Id.) He could walk two blocks and lift a maximum of thirty pounds.  (Id.)  Plaintiff denied alcohol and illicit drug use.  (Id. at 325.)  He smoked one and one-half pack of cigarettes a day.  (Id.) On examination, his speech and hearing were within normal limits; his fund of knowledge was normal, as was his affect, dress, and hygiene; his memory was intact.  (Id.)  He had "mild difficulties picking up a penny from the table with his hands."  (Id.)  An examination of his skin, eyes, ears, mouth, neck, and cardiac and pulmonary systems was normal.  (Id.)  His liver was enlarged.  (Id.)  He walked with a moderate limp, but could walk fifty feet unassisted and could tandem, heel, and toe walk.  (Id. at 326.)  He could hop and squat on his left leg but not

his right.  (Id.)  He had a decreased range of motion in his cervical spine.  (Id. at 326, 329.)

He had no difficulties getting on and off the examination table.  (Id. at 326.)  He had no

muscle atrophy and no spasms.  (Id. at 326.)  His pinch, grip, and arm strength in each hand

was 4/5.  (Id. at 326, 328.)  He had a full range of motion in his shoulders, elbows, wrists,

knees, hips, ankles, and lumbar spine.  (Id. at 328-29.)  Straight leg raises were negative.  (Id.

at 329.)  His lower extremity muscle strength was four out of five, with five being normal.

(Id.)  He had no edema in his lower extremities.  (Id. at 326.)  His liver was enlarged, but he

had no jaundice, ascites,[5] or asterixis.[6]  (Id.)  Dr. Leung's impression was of arthritis,

hyperthyroidism, and hepatitis C.  (Id. at 326.)

The same day, Plaintiff had a psychological consultative examination by John S.

Rabun, M.D.  (Id. at 332-33.)  No collateral sources were available for Dr. Rabun's review.

(Id. at 332.)  Plaintiff's chief complaint was occasionally being "'real sad.'"  (Id. at 332.)  He

reported that his psychiatric problems had begun when he was thirteen and that he had trouble

with recurring bouts of depression.  (Id.)  He often thought of suicide.  (Id.)  He had crying

spells "'for no real reason,'" was irritable and withdrawn, and, when depressed, felt he was

worthless.  (Id.)  He did not use drugs or alcohol.  (Id.)  He was not on any medications.  (Id.)

---

[5]Ascites, the abnormal accumulation of fluid in the abdominal cavity, is a common complication of hepatitis C.  See Iris W. Liou, M.D. Diagnosis and Management of Ascities, http://www.hepatitisc.uw.edu/go/management-cirrhosis-related-complications/ascites-diagnosis-management/core-concept/all (last visited May 4, 2015).

[6]Asterixis, an uncontrollable flapping of the hands, is a symptom of neurologic disturbances caused by hepatitis.  See Hepatic Encephalopathy, https://www.clinicalkey.com/topics/gastroenterology/hepatic-encephalopathy.html (last visited May 4, 2015).

On examination, Plaintiff appeared to be older than his age. (Id. at 333.) He was pleasant, cooperative, and had a logical, sequential, and goal-directed flow of thought. (Id.) He was alert and oriented. (Id.) His intellectual capacity appeared to be in the low average range. (Id.) "His insight and judgment were both preserved." (Id.) Dr. Rabun diagnosed Plaintiff with major depressive disorder, recurrent, in full remission. (Id.) Noting that Plaintiff was not currently depressed, Dr. Rabun thought it likely that, given Plaintiff's history, he would have future episodes of depression. (Id.) Plaintiff had a Global Assessment of Functioning (GAF) score of 50.[7] (Id.)

In November 2010, a Psychiatric Review Technique form (PRTF) was completed for Plaintiff by Ricardo Moreno, Ph.D. (Id. at 336-44.) Plaintiff had an affective disorder, i.e., major depressive disorder, which resulted in Plaintiff having mild restrictions in his activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Id. at 336, 339, 344.) It did not cause any episodes of decompensation of extended duration. (Id. at 344.)

Completing a Mental Residual Functional Capacity Assessment (MRFCA) of Plaintiff, Dr. Moreno concluded that, in the three abilities in the area of understanding and memory,

---

[7]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

Plaintiff was not significantly limited in one and was moderately limited in two, i.e., his abilities to (i) remember locations and work-like procedures and (ii) understand and remember detailed instructions. (Id. at 347.) In the area of sustained concentration and persistence, Plaintiff was not significantly limited in one of the seven abilities – his ability to carry out very short and simple instructions – and was moderately limited in the remaining six: his abilities to (i) carry out detailed instructions; (ii) maintain attention and concentration for extended period; (iii) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (iv) sustain an ordinary routine without special supervision; (v) work in coordination with or proximity to others without being distracted by them; and (vi) make simple work-related decisions. (Id. at 347-48.) In the area of social interaction, Plaintiff was not significantly limited in one of the five abilities, i.e., his ability to ask simple questions or request assistance, and was moderately limited in four: his abilities to (i) interact appropriately with the general public; (ii) accept instructions and respond appropriately to criticism from supervisors; (iii) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (iv) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Id. at 348.) In the area of adaptation, he was not significantly limited in one of the four abilities listed, i.e., his ability to be aware of normal hazards and take appropriate precautions, and was moderately limited in three: his abilities to (i) respond appropriately to changes in the work setting; (ii) travel in unfamiliar places or use public transportation; and (iii) set realistic goals or make plans independently of others. (Id.)

Also in November 2010, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by Tomago Wilson, a single decision-maker.[8] (Id. at 83-88.) The primary diagnosis was arthritis with a decreased range of motion in his cervical spine; the secondary diagnosis was hepatitis C; another alleged impairment was hyperthyroidism. (Id. at 83.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and, stand, walk, or sit for approximately six hours in an eight-hour day. (Id. at 84.) His ability to push or pull was otherwise unlimited. (Id.) He had one postural limitation, i.e., he should only occasionally climb ramps, stairs, ladders, ropes, or scaffolds. (Id. at 85.) He had no manipulative, visual, or communicative limitations. (Id. at 85-86.) He had environmental limitations of needing to avoid exposure to hazards. (Id. at 86.)

In April 2012, Plaintiff underwent an orthopedic evaluation by Alan H. Morris, M.D. (Id. at 498-510.) Plaintiff reported that he had stopped working fifteen years earlier because his place of employment had closed. (Id. at 498.) His chief complaints were of right shoulder pain, right hand swelling and numbness, and right knee and low back pain. (Id.) The shoulder pain had begun suddenly three years earlier. (Id.) Pain and weakness resulted in an inability to lift more than eight pounds below his shoulder. (Id.) He could lift over twenty pounds above his left shoulder. (Id.) He could not sleep on his right side, and

---

[8] See 20 C.F.R. § 404.906 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

frequently had difficulty getting his right hand into his hip pocket. (Id.) He could sit for thirty minutes and stand or walk for fifteen. (Id. at 498-99.) Also for approximately three years, Plaintiff had swelling in his right hand, causing him difficulties picking up small items, manipulating buttons and zippers, and using eating utensils. (Id. at 499.) If he elevates his right shoulder for three or four minutes, his fingers in his right hand tingle. (Id.) These problems have never been evaluated or treated. (Id.) Plaintiff has had right knee pain for approximately twenty-five years. (Id.) The knee tends to occasionally buckle when he walks. (Id.) And, his low back pain has been painful since he was seventeen years old. (Id.) The pain is constant with monthly flare-ups. (Id.) Each flare-up lasts for three weeks or longer. (Id.) When Dr. Morris noted that this would result in Plaintiff having "severe, disabling flare-ups of back pain virtually all the time," Plaintiff replied, "[a]fter thinking about it," that his description of the flare-ups was not quite correct but he could not be more specific. (Id.) Plaintiff further reported he takes naproxen and a medication for his thyroid disease. (Id. at 500.)

On examination, Plaintiff could walk fifty feet without a cane. (Id.) He walked with a mild right leg antalgic limp and a slight thrust of his right knee. (Id.) He held his right arm to the side. (Id.) He could toe walk, heel walk, and tandem gait and could squat to 110 degrees. (Id.) He stood with a flattened lumbar lordosis and had no lumbar muscle spasm. (Id.) The range of motion in his lumbar spine was limited to 60 degrees on flexion, 10 on right lateral bend, and 15 on left lateral bend. (Id.) He had 5/5 grip strength in both hands. (Id.) On each hand, he could oppose the thumb to all digits and make a fist. (Id.) There was

no sensory impairment or deficit in either hand.  (Id.)  His hands were callused and had embedded dirt.  (Id.)  The dorsum (back) of his right hand was slightly swollen.  (Id.)  He had moderate right deltoid atrophy in his right shoulder and diminished strength in his right biceps and triceps.  (Id. at 501.)  He had a diminished range of motion in his right shoulder and a slightly diminished range in his right wrist.  (Id. at 509.)  There was medial joint line tenderness of his right knee, but no joint effusion or thigh or calf atrophy.  (Id. at 501.)  He had 140 degrees flexion of that knee with full extension.  (Id. at 501, 510.)  His range of motion of his cervical spine was slightly limited.  (Id.)  He had a full range of motion in both hips.  (Id. at 510.)  There was no muscle weakness in either lower extremity.  (Id.)  Dr. Morris thought Plaintiff to be "of questionable reliability because of statements made during the course of the history."  (Id.)

Dr. Morris's impression was of limited motion of the right shoulder with arthralgia right shoulder, proximal biceps tendon rupture, and weakness in his right biceps and triceps; possible thoracic outlet syndrome in the right shoulder, causing paraesthesias in his right hand and a decreased pulse; probable osteoarthritis in his right knee; and low back pain.  (Id.)

On a Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Morris assessed Plaintiff as being limited to occasionally lift up to ten pounds with his right arm and fifty with his left; to frequently lift and carry up to twenty pounds with his left arm and no weight with his right arm; and to occasionally carry up to fifty pounds with his left arm and no weight at all with his right.  (Id. at 503.)  He could, without interruption, sit for thirty minutes and stand or walk for fifteen.  (Id. at 504.)  For a total during an eight-hour-

day, he could sit for five hours, stand for two, and walk for one.  (Id.)  He did not need to use

a cane to walk.  (Id.)  With his right hand, he could never reach, handle, finger, feel, push or

pull.  (Id. at 505.)  He could frequently perform all these activities with his left hand.  (Id.)

He was right-hand dominant.  (Id.)  He could frequently use either foot to operate foot

controls.  (Id.)  He could occasionally climb stairs and ramps, but should never balance,

stoop, kneel, crouch, crawl, or climb ladders or scaffolds.  (Id. at 506.)  He should never be

exposed to unprotected heights or the operation of a motor vehicle.  (Id. at 507.)  He could

perform such activities of daily living as shopping, traveling alone, preparing a simple meal,

and walking a block at a reasonable pace on rough or uneven surfaces.  (Id. at 508.)  He could

not sort, handle, or use papers and files.  (Id.)

The same day, Plaintiff had a psychological evaluation by Dianna Moses-Nunley,

Ph.D., a licensed psychologist.  (Id. at 523-30.)  Plaintiff's chief, and only, complaint was of

depression that had begun when he was in his early thirties.  (Id. at 523.)  The depression had

gone into remission several times.  (Id.)  Also, Plaintiff had tried to commit suicide several

times, the last being in 2003.  (Id.)  He had been hospitalized a few times for depression; the

last time was in 2011 for a few hours at St. Alexius.  (Id. at 524.)  He was taking Remeron

for depression, but its effectiveness was diminishing over time.  (Id.)  He was going to ask

his doctor to increase the dosage.  (Id.)  During the past month, Plaintiff's mood "ha[d] been

relatively good."  (Id.)  Approximately three times a week, he had periods of bad depression

for ten to fifteen minutes.  (Id.)  On those occasions, he employed coping strategies to

improve his mood.  (Id.)  Plaintiff further reported that he heard voices, but dealt with them

and attributed the hallucinations to thinking too hard.  (Id.)  Plaintiff can drive, but had his license taken away due to a driving under the influence charge.  (Id.)  He can cook, clean, shop, and pay bills, but has never had to because he has either lived with someone who did these chores or was incarcerated.  (Id.)  His social functioning was "good."  (Id.)  He did not have any significant problems with memory, but had to read something ten times because he forgot what he had read.  (Id.)  He did not have any problems with reading, writing, or comprehension.  (Id.)  He had last used heroin five months earlier and had last drunk alcohol in April 2011.  (Id. at 525.)  On examination, he was alert and oriented to time, place, person, and occasion.  (Id.)  He described his mood as good, and his affect was consistent with that description.  (Id.)  His immediate and remote memory and insight were adequate.  (Id. at 525-26.)  His abstract reasoning was fair, and his insight into his mental health issues was adequate.  (Id. at 526.)  Dr. Moses-Nunley noted that "[Plaintiff's] self reported history suggests that he has struggled with Major Depressive Disorder for many years, and at times it has been severe."  (Id.)  Plaintiff demonstrated, however, mild limitations in mental control and incidental memory.  (Id.)  He did not appear to have any impairment in understanding, remembering, or carrying out instructions.  (Id.)  "Based on his reported competencies in daily living and performance on cognitive tasks, there is no reason to expect significant impairments in his abilities to perform in a work setting."  (Id.)  "He appears to have no impairment in understanding, remembering, or carrying out instructions."  (Id.)  He had no significant impairment in social functioning.  (Id.)  He was diagnosed with major depressive

disorder, recurrent, mild. (Id.) His GAF was 67.[9] (Id.) His prognosis was fair with continued psychotherapy and medication. (Id.)

On a Medical Source Statement of Ability to Do Work Related Activities (Mental), Dr. Moses-Nunley assessed Plaintiff's ability to understand, remember, and carry out instructions as not being affected by his mental impairment, nor was his ability to interact appropriately with supervision, co-workers, and the public. (Id. at 528-29.) No other capabilities were affected by his impairment. (Id. at 529.)

## The ALJ's Decision

The ALJ determined that Plaintiff had not engaged in substantial gainful activity after applying for SSI and had severe impairments of arthritis in his right knee, hepatitis C, and major depressive disorder. (Id. at 21.) He did not have an impairment or combination thereof that met or medically equaled an impairment of listing-level severity, including Listing 1.02 (major dysfunction of a joint), Listing 5.05 (chronic liver disease), or Listing 12.04 (affective disorders). (Id. at 21-22.)

Addressing Plaintiff's mental impairment, the ALJ concluded that he had mild restrictions in his activities of daily living and no more than moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Id.

---

[9]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

at 22.)  Also, he had not experienced any episodes of decompensation of extended duration.
(Id.)

The ALJ next determined that Plaintiff had the residual functional capacity (RFC) to perform light work with additional limitations of only occasionally climbing stairs, ramps, ladders, ropes, and scaffolds; no more than frequently pushing and pulling with his right arm; and no more than frequent fingering and gross manipulation with his right and left hands.  (Id. at 23.)  Plaintiff was to avoid concentrated exposure to extreme cold.  (Id.)  He could understand, remember, and carry out at least simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple work-related decisions; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; adapt to simple, routine work changes, and perform repetitive work according to set procedures, sequence, or pace.  (Id.)

When assessing Plaintiff's RFC, the ALJ evaluated his credibility.  (Id. at 24-27.)  Noting that Plaintiff might honestly believe that his impairments are disabling, the ALJ found that Plaintiff's daily activities were not as limited as would be expected in someone with his complaints.  (Id. at 24, 25.)  Also detracting from his credibility were his criminal and drug history, the report of the investigators, and the objective medical evidence,[10] including the reports of the consultative examinations,[11] and inconsistencies in the record.  (Id. at 24-27,

---

[10]The Court notes that the majority of one paragraph of the medical evidence cited by the ALJ relates to another claimant of the same name.  (See Ex. 6F, R. at 350-78.)

[11]Included in these reports is that of Dr. Leung.  The ALJ summarizes in detail Dr. Leung's report, referring to by exhibit number and without explicitly identifying it as Dr. Leung's.  (See id.

28.) The ALJ gave great weight to the opinion of Dr. Moreno, some weight to that of Dr. Moses-Nunley, and little weight to that of Drs. Rabun and Morris,[12] finding the latter to be inconsistent with their own findings and with the medical evidence. (Id. at 27-28.)

Addressing the function report completed by Plaintiff's brother and supportive of his allegations,[13] the ALJ found the observations therein to be inconsistent with the preponderance of the evidence and to be colored by affection for Plaintiff. (Id. at 28.)

Noting that Plaintiff has no past relevant work, the ALJ found that with his age, education, and RFC he can perform jobs that exist in significant numbers in the national economy, including the representative occupations cited by Dr. Cook. (Id. at 28-29.) Plaintiff was not, therefore, disabled within the meaning of the Act. (Id. at 29-30.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the

---

at 25-26.)

[12] As was Dr. Leung's, Dr. Morris's report is summarized but referred to by exhibit number. (See id. at 26.)

[13] See Record at 196-203.

impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. § 416.920 (a)).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 416.920(c).  A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits.  **Bowen v. City of**

**New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and

set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work. **Moore**, 572 F.3d at 523.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work or, as in the instant case, has no such work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff

v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

### Discussion

Plaintiff argues that the ALJ erred (1) when assessing his RFC because it is neither supported by the evidence nor complete; (2) when evaluating the various medical opinions; and (3) by failing to consider the Missouri HealthNet finding.

RFC.  The RFC at issue provides that Plaintiff is limited to performing light work[14] with additional restrictions of (a) only occasionally climbing stairs, ramps, ladders, ropes, and scaffolds; (b) no more than frequently pushing and pulling with his right arm; (c) no more than frequent fingering and gross manipulation with his right and left hands; and (d) avoiding exposure to extreme cold.  Also, Plaintiff has the RFC to (i) understand, remember, and carry out at least simple instructions and non-detailed tasks; (ii) demonstrate adequate judgment to make simple work-related decisions; (iii) respond appropriately to supervisors and co-workers

---

[14]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b).

in a task-oriented setting where contact with others is casual and infrequent; (iv) adapt to simple, routine work changes; and (v) perform repetitive work according to set procedures, sequence, or pace.

As noted above, residual functional capacity is the most a claimant can do despite his physical or mental limitations. **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ bears the responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. See **Goff**, 421 F.3d at 793; **Eichelberger v. Barnhart**, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.945(a). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination. **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010); **Eichelberger**, 390 F.3d at 591; **Hutsell v. Massanari**, 259 F.3d 707, 711-12 (8th Cir. 2001). Accordingly, the ALJ must "consider at least some supporting evidence from a [medical] professional" and should obtain medical evidence that addresses the claimant's ability to function in the workplace. **Id.** at 712 (internal quotation marks) (alteration in original).

Plaintiff first challenges the ALJ's RFC findings as failing to correspond to any medical opinion in the record.

The evidence before the ALJ included few records of medical treatment. In addition to those generated when Plaintiff was confined in the DOC – all predating his amended alleged disability onset date – and when he was in the Bridgeway residential treatment

program, Plaintiff's treatment records consist of three visits to Dr. Little (one in April 2011, one in May 2011, and one in January 2012), one emergency room visit (in May 2011), one visit to Dr. Pelican (in November 2011), and one visit to Ms. Hubbar (in January 2012). The emergency room visit resulted from Plaintiff drinking after a period of abstinence. The visits to Dr. Pelican and Ms. Hubbar were for his hepatitis. At the latter visit, Plaintiff had no muscle aches, no joint pain, and no depression. His extremities were all normal. Similarly, at his last visit to Dr. Little, occasioned by a need for renewal of his hepatitis medication, he had no swelling in his extremities.

In contrast, the records of consultative examinations of Plaintiff are far more extensive and include assessments of Plaintiff's physical or mental abilities and limitations. For instance, Dr. Leung found Plaintiff capable of walking two blocks and lifting thirty pounds. Dr. Morris found he could stand and walk for fifteen minutes, sit for thirty minutes, and occasionally lift ten pounds with his right arm and fifty with his left. Dr. Leung noted that Plaintiff had mild difficulties picking up a penny and a pinch grip of 4/5. Dr. Morris noted that Plaintiff's hands were callused and embedded with dirt and that he had a 5/5 grip strength. He also noted that Plaintiff reported swelling and numbness in his right hands for the past three years that caused difficulties manipulating buttons and zippers and using eating utensils – presumably unaware that Plaintiff reported no difficulties dressing or feeding himself or in reaching – and restricted him from reaching, handling, fingering, feeling, pushing, or pulling with his right hand. Having been incorrectly informed that Plaintiff did not use drugs or alcohol and having no records to review, Dr. Rabun assessed Plaintiff as having major

depressive disorder in full remission but a GAF reflective of serious symptoms. Dr. Moses-Nunley noted Plaintiff's report of suffering from depression since he was in his 30s, but found no relevant abilities to be affected by that impairment.

As noted by Plaintiff, the ALJ's RFC findings do not directly correspond to the assessments of the consultative examiners. Contrary to Plaintiff's position, however, the ALJ's duty is not to simply incorporate the various assessments of a claimant's physical or mental abilities into a unified RFC finding.

"[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." **Martise v. Astrue**, 641 F.3d 909, 927 (8th Cir. 2011) (second alteration in original) (quotations omitted). Rather, "'[t]he Social Security Administration . . . regulations establish that an ALJ will evaluate every medical opinion, regardless of its source,'" **Miller v. Colvin**, — F.3d —, 2015 WL 1881189, *5 (8th Cir. Apr. 27, 2015) (quoting Wiese, 552 F.3d at 730) (alterations in original), and "bear[ ] 'the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence,'" **id.** (quoting Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010)). "[A] claimant's residual functional capacity[, however,] is 'ultimately an administrative determination reserved to the Commissioner.'" **Id.** (quoting Cox v. Astrue, 495 F.3d 614, 619-20 (8th Cir. 2007)). In the instant case, the ALJ evaluated the various assessments of Plaintiff's capacities together with the other relevant evidence, including Plaintiff's medical records, testimony, and reports. See e.g. **Kamann v. Colvin**, 721 F.3d 945, 950 (8th Cir. 2013) (rejecting claim that ALJ's RFC determination was unfounded because

it was unsupported by psychologists' opinions although it was supported by the record as a whole).

Plaintiff further argues that the ALJ failed to reconcile his conclusion that Dr. Moreno's assessment was entitled to great weight with his "silent[]" rejection of several of the limitations found by Dr. Moreno, e.g., Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods. The ALJ restricted Plaintiff to those mental tasks requiring simple decisions, instructions, and tasks. These restrictions are consistent with the abilities in which Dr. Moreno found no significant limitations. See e.g. **McKinney v. Apfel**, 228 F.3d 860, 863 (8th Cir. 2000) (finding no error in an RFC which recognized that the claimant had mental impairments and could not perform complex or technical work but was also not disabled).

The ALJ also failed, Plaintiff contends, to discuss Dr. Leung's opinion. This is significant because it is consistent with Dr. Morris's opinion and the omission leaves the record devoid of any medical report on which the ALJ could base his RFC determination.

The ALJ did discuss Dr. Leung's opinion, but referred to it by exhibit number rather than by author. (See R. at 25-26.) Its frailties are similar to those of Dr. Morris's opinion. For instance, Plaintiff reported to Dr. Leung that he had difficulties gripping things with his hand. Dr. Leung's examination revealed *mild* difficulties picking up a penny and a 4/5 pinch and grip strength. Plaintiff reported to Dr. Morris that he had difficulties manipulating buttons, zippers, and eating utensils. On examination, he had 5/5 grip strength and callused hands. Even so, Dr. Morris concluded he could not use his right hand for fine finger

manipulation. The restrictions in Dr. Morris's assessment cited by Plaintiff as being supported by Dr. Leung's report are those based on Plaintiff's description of his abilities, not on any examination findings. The ALJ "'was entitled to give less weight to [either physician's] opinion, because it was based largely on [Plaintiff's] subjective complaints rather than on objective medical evidence' and could further discount or disregard any conclusions based on [Plaintiff's] subjective complaints." **Cline v. Colvin**, 771 F.3d 1098, 1104 (8th Cir. 2014) (quoting Kirby v. Astrue, 500 F.3d 605, 709 (8th Cir. 2007)).

Although Plaintiff did not challenge the ALJ's adverse credibility determination in his opening brief, the Commissioner argues in support of that determination in her brief. The underlying considerations cited by the ALJ and the Commissioner – Plaintiff's daily activities, his criminal background, lack of supporting objective evidence, inconsistencies in the record – are supported by the record.[15]  See e.g. **Kamann**, 721 F.3d at 951-52 (affirming ALJ's credibility finding based on discrepancies between claimant's self-reported limitations and observed capacities); **Whitman v. Colvin**, 762 F.3d 701, 705 (8th Cir. 2014) (deferring to credibility finding of ALJ who discounted the claimant's allegations of limited daily activities on the grounds that the activities could not be objectively verified and that, even if they were as restricted as alleged, the degree of limitation could not be attributed to his medical condition); **Halverson v. Astrue**, 600 F.3d 922, 931-32 (8th Cir. 2010) (lack of supporting

---

[15]Plaintiff argues in his reply brief that the ALJ provided only a one-paragraph finding as to his credibility. This is not correct. The paragraph cited by Plaintiff is but a summary of the ALJ's credibility determination. The ALJ made various findings as to Plaintiff's credibility throughout five pages of his decision.

objective medical evidence proper consideration when evaluating credibility); **Van Vickle v. Astrue**, 539 F.3d 825, 828 (8th Cir. 2008) (inconsistencies in record detract from credibility); **Simmons v. Massanari**, 264 F.3d 751, 756 (8th Cir. 2001) (incarceration supported adverse credibility determination).

Another consideration cited by the ALJ when evaluating Plaintiff's credibility was the report of the investigators. Plaintiff argues that the report *supports* his credibility. Specifically, the investigators saw him "walking for less than two minutes, while [Dr. Morris] observed that Plaintiff could walk 50 feet unassisted." (Pl.'s Reply Br. at 2.) The investigators saw Plaintiff alternatively sit and stand for ten minutes – an observation consistent with Dr. Morris's assessment of those exertional capacities. (Id.) Plaintiff's summary of the report is accurate; his conclusions, however, are unfounded. The length of time the investigators saw Plaintiff walk was determined by how long it took Plaintiff to walk to the building; there is no implication that the time was determined by Plaintiff's exertional limitations. Similarly, the investigators saw Plaintiff sit and stand because he was in the process of exiting a light rail car and waiting on a bench for a bus. Also, Plaintiff overlooks the investigators' description of his walk, i.e., at a fast pace and with a normal gait, before and after he appeared in Dr. Morris's office with a mild right leg antalgic limp, and of his ability to examine papers as he walked.

Plaintiff further argues that the ALJ's decision is flawed because the hypothetical to Dr. Cook did not include the gross manipulation restriction he included in his RFC determination. The ALJ included in his second hypothetical limitations of Plaintiff being able

to only occasionally reach overhead with his right arm and lifting restrictions with the right arm. Also, Plaintiff was limited to no more than frequent pushing and pulling with his right arm. In his RFC, the ALJ found Plaintiff could perform no more than frequent fingering and gross manipulation with his right and left hands. Under the definition of "inability to perform fine and gross movements effectively," the regulations provide that "[t]o use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(c). The jobs cited by Dr. Cook – garment sorter, <u>DOT</u> 222.687-014, 1991 WL 672131 (G.P.O. 1991); photocopying machine operator, <u>DOT</u>, 207.685-014, 1991 WL 671745 (G.P.O. 1991); and office helper, <u>DOT</u>, 239.567-010, 1991 WL 672232 (G.P.O. 1991) – all comply with the ALJ's RFC manipulation restriction. <u>See</u> **Grable v. Colvin**, 770 F.3d 1196, 1202 (8th Cir. 2014) ("An ALJ may rely on a vocational expert's testimony as long as some of the identified jobs satisfy the claimant's residual functional capacity.").

Plaintiff next argues that the ALJ fatally erred by not providing a narrative discussion of the evidence supporting his RFC determination. An "ALJ need not provide a narrative discussion immediately following each statement of an individual limitation in the RFC, if the court can otherwise discern the elements of the ALJ's decision-making." **Jones v. Astrue**, 2011 WL 4445825, *10 (E.D. Mo. Sept. 26, 2011) (citing <u>Depover</u>, 349 F.3d at 567). <u>See also</u> **Hilgart v. Colvin**, 2013 WL 2250877, *4 (W.D. Mo. May 22, 2013) (finding that a requirement that an ALJ "follow each RFC limitation with a list of specific evidence on which

the ALJ relied" to be inconsistent with the court's duty to base its decision on "all the relevant evidence") (internal quotations omitted).  In the instant case, the Court can discern those elements and finds them supported by substantial evidence on the record as a whole.

The Opinions of Drs. Morris and Rabun.  Plaintiff contends that the ALJ failed to apply the factors of 20 C.F.R. § 416.927(c) when evaluating the opinions of Drs. Morris and Rabun.  This provision governs how medical opinions are to be weighed and requires that more weight is generally given to the opinion of an examining source than to the opinion of one who is not.  Id.  Also relevant is the supportability of a medical opinion, i.e., medical signs, laboratory findings, and explanations; the consistency of the opinion with the record as a whole; the specialization of the source; and other factors, e.g., the source's understanding of the Commissioner's disability programs. 20 C.F.R. § 416.927(c)(3)-(6).[16]

Drs. Morris and Rabun are specialists who examined Plaintiff.  Other considerations do not favor giving their respective opinions greater weight.  For instance, both relied on Plaintiff's description of his abilities and limitations.  The report of each was internally inconsistent.  For instance, Plaintiff's pinch and grip strength were 5/5 and he was found to be of "questionable reliability," but Dr. Morris restricted his use of his right hand.  Dr. Rabun found Plaintiff's depression to be in full remission but assigned him a GAF reflective of serious symptoms.  And, neither Dr. Morris's or Dr. Rabun's opinions were consistent with the record as a whole.  Dr. Rabun reported that Plaintiff did not use illegal drugs or alcohol

---

[16]Another factor, the treatment relationship, see 20 C.F.R. § 416.927(2),is irrelevant as Drs. Morris and Rabun were consulting sources.

at a time when, according to Plaintiff's report to another provider, he was using heroin. Dr. Morris reported that Plaintiff walked with a mild antalgic gait, yet Plaintiff was seen walking with a normal gait before and after seeing Dr. Morris. These considerations were discussed by the ALJ. (See R. at 27 (noting that Dr. Rabun's conclusion that Plaintiff lacked the capacity to interact appropriately in social setting was inconsistent with his own objective findings and with the medical evidence) and 28 (noting that Dr. Morris's assessments of Plaintiff's limitations were inconsistent with his own objective findings and with the record as a whole)).

The HealthNet Finding. In his third, and final argument, Plaintiff contends that the ALJ improperly failed to follow the dictates of Social Security Ruling 06-03p that "all the evidence in the case record that may have a bearing on [the Commissioner's] determination or decision of disability, including decisions by other governmental and nongovernmental agencies" be considered." SSR 06-03p, 2006 WL 2329939, *6 (S.S.A. Aug. 9, 2006). "These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules." Id.

The decision at issue is one in August 2011 by the Missouri Department of Social Services (DSS) approving Plaintiff for benefits under the Missouri HealthNet for the Aged, Blind and Disabled. The decision does not cite any impairments or evidence. The only specific information is that the start date is February 2011. This is one year after Plaintiff's release from prison and six weeks before his first non-DOC generated medical record after

2001 – the March 2011 medical record of his voluntary admission to a residential treatment program for drug addicts.

In **Hutchison v. Astrue**, 2011 WL 5838519, *2 (W.D. Mo. 2011), the court rejected a similar argument, finding that the ALJ's failure to explicitly discuss the DSS disability determination was harmless error. "DSS's decision is conclusory; it simply identifies Plaintiff's impairments, discusses the law applicable to its determination, and finds him disabled. No reasons are given why DSS found Plaintiff's impairments rendered him disabled. Thus, even if the ALJ had explicitly considered DSS's decision, it would not have changed her determination." **Id.** The lack of prejudicial error in Plaintiff's case is even stronger. No impairments are identified; no applicable law is discussed; no reasons are given. Moreover, the effective date of the decision is during a period when the only impairment for which Plaintiff was seeking medical attention was drug addiction – an impairment which cannot support a claim for disability under the Act. See 42 U.S.C. § 1382c(a)(3)(J). And, Plaintiff testified that he did not seek treatment for his impairments until he received Medicaid. See **Estes v. Barnhart**, 275 F.3d 722, 725 (8th Cir. 2002) (Under the Act, "[a]n impairment which can be controlled by treatment or medication is not considered disabling.").

## Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue,

528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, is within the zone of choice and will not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  6th  day of May, 2015.